Simons, J.
(dissenting). The majority has rejected the idea that prison inmates are per se in custody for purposes of Miranda. I agree. Rejection of the per se rule accurately reflects law to be found in recent Supreme Court decisions and is consistent with the underlying purposes of Miranda. More *113 over, that view recognizes the obvious, that the traditional two-prong custody and interrogation test of Miranda is unworkable in the context of prison life.
I disagree with the majority, however, for three reasons. First, I find no basis for its decision to remit this case for further fact finding. The courts below used the same legal test that the majority adopts today. Those courts concluded that defendant was not subject to added restraints and therefore not in custody for Miranda purposes. Those findings are supported by evidence in the record and thus are binding on this Court. Inasmuch as no question of law was decided wrongly, the Court is required to affirm. In an attempt to avoid that result, the majority first contends that the suppression court misunderstood what constituted "an added restraint”. No fair reading of County Court’s decision can support that conclusion. Next, the majority improperly suggests that the burden of proof is on the People to establish that defendant was not in custody for purposes of Miranda (majority opn, at 102). Federal case law makes clear that the burden of establishing custody rests with the defendant. Finally, although the added restraints test adopted by the majority enjoys support in other jurisdictions, the most recent Supreme Court decision in this area suggests a different analysis in applying Miranda to prison questioning: whether the interrogation takes place under circumstances that, when viewed objectively, can be said to present a danger of coercion. In my view, such an analysis more adequately reflects the underlying purposes of Miranda and better accommodates the distinctive context of prison life and the unique needs of prison administration and order.
Nor can I join Chief Judge Kaye’s opinion. She applies a per se rule. In Chief Judge Kaye’s view, inmates are always in custody for Miranda purposes and therefore any questioning, no matter how benign or routine, must be preceded by warnings if it might elicit an incriminating response. That is so, Chief Judge Kaye would hold, unless some undefined public safety emergency exception, to be explained in the future, applies. The rule places an impossible burden on the effective management of the prison system.
Undoubtedly, prison inmates must be given Miranda warnings in some situations before being questioned. The test should be whether the interrogation takes place under circumstances which, when viewed objectively, can be said to present *114 a danger of coercion. Because the suppression court here employed this test, as well as the added restraints test, and concluded that defendant was not in custody for Miranda purposes, I would affirm the order of the Appellate Division.
I
The majority supports its conclusion that a remittal for new fact finding is needed by asserting that County Court failed to apply the added restraints test correctly and that the record of the hearing court was insufficient to render a decision on that issue. Any fair reading of the court’s decision and the record from the hearing proves otherwise.
County Court clearly stated its holding following the suppression hearing: "The Court thus does not find any indicia that the interview between Rhodes and the defendant [was] inherently coercive or entailed a measure of restriction upon the defendant’s movement 'over and above’ that generally imposed by reason of his incarceration” (emphasis added). The Appellate Division affirmed, citing to a Federal case that likewise applied the added restraints test (see, United States v Conley, 779 F2d 970, 974, cert denied 479 US 830 [defendant’s "freedom of movement cannot be characterized as more restricted than that of other prisoners”]). The majority now accepts that same test — i.e., custody will be found when the circumstances "entail added constraint that would lead a prison inmate reasonably to believe that there has been a restriction on that person’s freedom over and above that of ordinary confinement in a correctional facility” (majority opn, at 100). Nevertheless, it claims it is not bound by the findings of County Court because that court erroneously required that the additional restraints be coercive (majority opn, at 102).
That reading of County Court’s decision is possible only if one ignores the disjunctive language of County Court’s holding, as the majority has done (see, majority opn, at 101). County Court did use a second test — whether the evidence showed that the interview was "inherently coercive” — but the two tests were clearly stated in the alternative. If any legal error occurred, it was to the benefit of defendant, for he was given the opportunity to prevail under the added restraint test or the "inherently coercive” test. The evidence in the record supports the court’s findings under either test and the Appel *115 late Division affirmed the suppression court’s findings.[1] The import of all of this is obvious: Having applied the right test and been affirmed by the Appellate Division, County Court’s decision is not subject to further review by this Court unless there is no evidence in the record to support its conclusions (People v Centano, 76 NY2d 837; NY Const, art VI, § 3 [a]; CPL 470.35).
Nor can the majority find support for its decision to remit in the fact that the hearing record is, in its view, incomplete (majority opn, at 102). When a court applies the wrong legal test to the facts, as the majority claims happened here, the accepted remedy is to remit for the hearing court’s application of the proper test to the facts already on the record (see, People v Morales, 65 NY2d 997, 998). That is an entirely different matter from what the majority does in this case: Remit for a new fact-finding hearing. Admittedly, the record is scant, but that is no more grounds for a new hearing than the failure by a moving party to make its case in any proceeding. Manifestly, when a full and fair hearing has been provided, as it was here, gaps in the record are to be construed against the party with the burden of proof — not treated as a basis for giving that party a second chance to make the case.[2]
In discussing how the new suppression hearing should examine the evidence, the majority implies that it is the burden of the People to show that defendant was not subjected to added restraints and therefore not in custody (majority opn, at 102). That reverses well-settled law. The burden of proving custody is on defendant, as the courts below properly held (see, United States v Charles, 738 F2d 686, 692). The point was made clear in Berkemer v McCarty (468 US 420), the principal decision relied upon by the majority today. The Supreme Court stated there: "[Respondent has failed to demonstrate that, at any time between the initial stop and the arrest, he was subjected to restraints comparable to those associated *116 with a formal arrest” (at 441 [emphasis added]). The Federal rule stated in Berkemer and Charles is consistent with the rule in New York, which holds that the burden of persuasion on a suppression motion remains with defendant (People v Di Stefano, 38 NY2d 640, 652). Thus, when reviewing the record the Court must determine if defendant established he was in custody at the time he was questioned.
When the burden is properly assigned, it is manifest that the evidence in the record supports the suppression court’s factual conclusion that custody above and beyond incarceration — i.e., added restraints — was not proved. The sole witness at the suppression hearing was Michael Rhodes, the officer who questioned Alls. Except for Rhodes’ testimony that he "took” defendant from his dormitory area to the basement recreation area, there is no evidence whatsoever of the circumstances surrounding Alls’ movement. Defendant presented no evidence whether he felt compelled to go, whether he wanted to go somewhere private, whether Rhodes issued an order to him, or whether some other circumstance was involved (cf., People v Ripic, 182 AD2d 226, 231-232, appeal dismissed 81 NY2d 776). Defendant likewise failed to make any record of the physical circumstances of the basement — for instance, whether public access to the recreation room was cut off, whether the room was physically isolated from the rest of the dormitory, or whether others were passing nearby during the course of the interview.
Thus, the record before the County Court Judge supported his conclusion that Officer Rhodes had applied no added restraints to defendant’s freedom in procuring a place where he and defendant could speak with some privacy. Had some other Judge been presiding, perhaps a different determination would have been made from this evidence. But that is not the test. Our review is limited by the State Constitution to a determination of whether there is evidence in the record to support the suppression court’s finding. There is, and therefore our review of the facts should be at an end.
But the problems with the record and appellate procedure aside, I find myself unable to accept the majority’s added restraints test. While this approach properly avoids the per se rule of Mathis v United States (391 US 1) — that incarceration itself is custody for Miranda purposes — I question how workable the test will be for the courts and for prison officials. For well-founded security reasons, prisoners are routinely sub *117 jected to certain restraints when they are being moved to a new location. At other times, for their own protection, inmates may be removed from their living area so they can speak freely about incidents under investigation without the risk of being overheard inculpating fellow inmates. In fact, prison officials are required by State regulation to investigate incidents "as quietly and routinely as possible” (7 NYCRR 251-1.1). Accordingly, as a matter of practicality and regulation, and for the safety of the inmate, officials will often be required to move them to less public settings for questioning. Arguably, they will be imposing additional restraints by doing so, yet courts and prison officials might rightly doubt whether such routine prison procedures, without more, create the kind of inherently coercive atmosphere Miranda was designed to combat. Thus, the added restraints test poses a dilemma: If it is applied literally, the difference between it and the per se rule of Mathis will be negligible; if it is not, the term "added restraint” becomes largely meaningless. The test, as applied over time, will likely be rendered overinclusive or hollow. Neither the rights of prisoners nor the needs of prison administration will be well served in either case.
II
I believe the Supreme Court’s decision in Illinois v Perkins (496 US 292) offers a better test for resolving this and other cases involving prison inmates.[3]
*118 A.
The problem is best defined by reexamining the basic principles underlying Miranda’s requirement that a person must be advised of his or her rights before being subjected to custodial interrogation. The decision arose out of a concern that those interrogated while isolated in custody might incriminate themselves in the face of compelling physical or psychological pressure (Miranda v Arizona, 384 US 436, 444-450). Accordingly, Miranda does not foreclose all questioning undertaken without appropriate warnings, but instead applies only to "custodial interrogation” (id., at 444; see also, Illinois v Perkins, supra, at 296). Following the Miranda decision, the courts were faced with the problem of defining what exactly constitutes custodial interrogation — and therefore implicates the concerns underlying the decision — amid the varied circumstances in which citizens encounter police. What emerged was the two-prong test of custody and interrogation. In determining whether someone was "in custody”, the relevant inquiry is whether a reasonable person in the suspect’s position would have believed he was restrained to a degree associated with formal arrest (Berkemer v McCarty, 468 US 420, 442, supra; see also, California v Beheler, 463 US 1121, 1125; 1 LaFave and Israel, Criminal Procedure § 6.6, at 105 [1991 Pocket Part]). The "interrogation” prong, on the other hand, was drawn broadly: Interrogation occurs whenever the words and actions of the police are likely to elicit an incriminating response (Rhode Island v Innis, 446 US 291, 300-301).
Under that traditional analysis, all prisoners are technically "in custody”, restrained to a degree associated with formal arrest and never at liberty to leave an interview conducted by prison officials. Thus, to analyze prisoner interrogation in traditional Miranda terms, as the Chief Judge does today, is to say that the custody prong is met per se whenever an inmate is interrogated by officials. Because the interrogation prong is so easily met — -it is hard to imagine how prison officials can look into a complaint or incident without asking questions likely to elicit incriminating responses — adherence to the traditional test would require that formal warnings be given prior to the myriad inquiries that occur daily in prison life, no matter how casual, routine or nonthreatening the questioning may in fact be. That, of course, is a far more *119 expansive application of the Miranda requirement than the courts have applied in nonprison settings (see, e.g., Berkemer v McCarty, supra; People v English, 73 NY2d 20; People v Yukl, 25 NY2d 585).
Such an outcome is inconsistent with both the underlying purpose of Miranda — curbing coercive interrogation by investigators — and with the plain language of the decision: "General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding” (Miranda v Arizona, 384 US 436, 477, supra). Therein lies the dilemma posed by this case: On the one hand, general questioning and fact finding expressly fall outside the Miranda rule, for such inquiries serve important public purposes and do not implicate concerns of coercion. On the other, when the incident being investigated has occurred inside prison walls, the general questioning and fact finding necessarily take place in a custodial setting where concerns about coercion may be implicated.
B.
There can be no doubt that questioning by prison officials sometimes takes on the quality of a police-dominated interrogation, and Miranda should obviously apply in those cases. But at other times the questioning of an inmate has decidedly more in common with the sort of routine investigative questioning police engage in outside prison which does not require warnings (see, People v English, 73 NY2d 20, supra [role that parole officer is playing at time of questioning is relevant to Miranda inquiry]; People v Yukl, supra [warnings not required to precede station house interrogation]). Plainly put, the traditional two-prong analysis is incapable of distinguishing between those two types of prison inquiries and will dictate suppression in circumstances far removed from the legitimate concerns that gave birth to the Miranda rule. Prisoners certainly retain the right to be free from the kind of coercive interrogations that Miranda warnings are intended to deter, but it is equally clear that the analysis of when Miranda will apply must necessarily reflect the distinctive context of life in prison. As the Supreme Court has said: "Fidelity to the doctrine announced in Miranda requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated” (Berkemer v McCarty, 468 US 420, 437, supra).
*120 The idea that the traditional two-prong analysis is unworkable in a prison context is not merely a matter of common sense. It flows directly from the Supreme Court’s most recent ruling in a Miranda case involving an incarcerated suspect. In Illinois v Perkins (496 US 292, supra), the Court ruled that a trial court could admit into evidence a confession made by an inmate to an undercover agent posing as a fellow prisoner even though no Miranda warnings were given. Under the traditional analysis, Perkins was undoubtedly in custody and interrogated. In fact, the Supreme Court acknowledged that he was (see, at 297, 299). Yet, the Supreme Court concluded that no Miranda warnings were required. Rather than mechanically apply the traditional two-prong analysis, the Court instead looked to Miranda’s original purposes and advanced another test: Whether the circumstances of the encounter "implicate[d] the concerns underlying Miranda” — in other words, whether the risk of coercion was present (at 296).[4]
As the majority correctly points out, Perkins forecloses the use of the traditional two-pronged custody and interrogation test (majority opn, at 97-98). Thus, defendant’s reliance on Mathis v United States (391 US 1, supra), where Miranda was applied to a tax agent’s questioning of an inmate, is particularly misplaced. Mathis was incarcerated; Perkins was incarcerated. Mathis was interrogated; Perkins was interrogated. If the traditional Miranda analysis operative in Mathis were still good law, the result in Perkins should have been suppression. Instead, the Supreme Court expressly distinguished the two cases on a basis unrelated to either the custody test or the interrogation test: The fact that there was no "possibility that the suspect might feel coerced” when the interrogator was a fellow prisoner (Illinois v Perkins, supra, at 299). Like the majority, I too conclude that the Perkins Court intended a different analysis to apply in prison settings when it said: "The bare fact of custody may not in every instance require a warning even when the suspect is aware that he is speaking to an official, but we do not have occasion to explore that issue here” (at 299).
*121 c.
The Supreme Court’s methodology for distinguishing Mathis in Perkins articulates a principled basis for determining when Miranda warnings should be required in prison cases. The test is whether a "danger of coercion resulted] from the interaction of custody and official interrogation” (Illinois v Perkins, supra, at 297; see, Carr v State, 840 P2d 1000 [Alaska]). Because Miranda is a prophylactic rule and may require suppression even in the absence of actual coercion, the analysis does not turn on a case-by-case analysis of the voluntariness of the statement or the subjective state of mind of the inmate. Instead, it is the danger or possibility of coercion — not coercion itself — that triggers the Miranda requirement.
This is precisely the analysis that the suppression court stated and applied as an alternative to the added restraints test. I would hold that it was correctly applied and that there was evidence on the record to support the court’s conclusions, as affirmed by the Appellate Division. Officer Rhodes was the sole witness at the suppression hearing, and what emerges from the record is a picture of an officer engaging in rudimentary fact finding about a possible rules infraction, uncertain whether Alls had even been a participant in the previous night’s incident. Officer Rhodes testified that before coming to see Alls, he had been given only "limited” background information or "none” at all. So limited was his knowledge, in fact, that he had to ask Alls whether Alls had been involved in the fight. He did not raise the sodomy allegation because, he testified, "[Alls] didn’t mention it and * * * I didn’t even know it was an issue.”[5] Nothing in the record indicates that Rhodes went into the interview viewing it as part of a criminal investigation. In fact, he testified that at the conclusion of the interview he intended to handle the matter through the prison’s internal disciplinary proceedings.
Beyond that, nothing about the conditions of the interview suggests a danger of coercion. Alls was questioned in his own residential unit, a dormitory-like building in a low security facility. Officer Rhodes testified that he "took” Alls to the building’s recreational/kitchen area for privacy, but the record is silent as to whether Alls volunteered to go, expressed reluctance or had any reaction at all. There is no reason to *122 assume from this that the move was made to intimidate Alls any more than we can assume it was made to protect Alls from being overheard should he "snitch” on one of his fellow prisoners. While prison regulations require inmates to go with officers when so ordered, the record does not indicate whether any order was given. Nor does the record show that the area where the questioning was conducted was physically restrictive, isolated or intimidating in any other way.
In short, while Alls was technically in custody and interrogated, the record falls well short of establishing that the danger or possibility of coercion was present in these circumstances. Given that, I conclude Miranda warnings were not required here.
Ill
Miranda remains a vital source of protection for all our citizens, including incarcerated individuals. Its vitality depends, however, on clear and principled application of its rule in cases where concerns about coercive custodial interrogation are truly implicated. Because I believe no danger of coercion existed in the circumstances under which the questioning occurred here, and no legal error was made by the courts below, I would vote to affirm the order of the Appellate Division.
Judges Titone, Hancock, Jr., and Smith concur with Judge Levine; Chief Judge Kaye dissents in part and votes to reverse, grant defendant’s motion to suppress and order a new trial, in a separate opinion; Judge Simons dissents and votes to affirm in another opinion in which Judge Bellacosa concurs.
Order modified, etc.

. All of these facts from the record were cited by County Court in support of its dual conclusions that there were no coercive circumstances or added restraints: (1) that defendant was not "restrained, shackled or handcuffed”; (2) that the questioning was brief; (3) that the setting of the basement was "office-like”; (4) that defendant was not advised that his immediate freedom of movement was curtailed; and (5) that there was no proof that "he was not free to break off the interview”.

. People v Dodt (61 NY2d 408) and People v Havelka (45 NY2d 636) cited by the majority are not in point. In those cases, the Court addressed situations in which a party had either been denied a hearing or a fair opportunity to present its evidence. Defendant claims neither here.

. Though the added restraints test has been widely accepted in other jurisdictions, the Supreme Court, although presented with opportunities to do so, has never adopted the rule (see below). The Court has denied or dismissed certiorari in at least eight cases where it was used. In the absence of Supreme Court precedent embracing the added restraint test, I believe Perkins offers the clearest guidance on Federal law relevant to the prison Miranda issue at the present time.
Federal decisions adopting an added restraints test in prison Miranda cases include United States v Rogers (899 F2d 917 [10th Cir], cert denied 498 US 839); Leviston v Black (843 F2d 302 [8th Cir], cert denied 488 US 865); United States v Cooper (800 F2d 412 [4th Cir]); United States v Conley (779 F2d 970 [4th Cir], cert denied 479 US 830); United States v Scalf (725 F2d 1272 [10th Cir]); Cervantes v Walker (589 F2d 424 [9th Cir]) (see also, United States v Willoughby, 860 F2d 15, 23-24 [2d Cir]; United States v Cofield, 1992 US App LEXIS 8284 [6th Cir]). High courts of our sister States have reached a similar result (see, State v Post, 118 Wash 2d 596, 826 P2d 172; Whitfield v State, 287 Md 124, 411 A2d 415, cert dismissed 446 US 993; State v Bradley, 236 Neb 371, 461 NW2d 524, cert denied 502 US —, 112 S Ct 143; State v Bradley, 42 Ohio St 3d 136, 538 NE2d 373, cert denied 497 US 1011, supra; State v Vickers, 159 Ariz 532, 768 P2d 1177, cert denied 497 US 1033; People *118 v Patterson, 146 111 2d 445, 588 NE2d 1175, cert denied — US —, 121 L Ed 2d 73; Beamon v Commonwealth, 222 Va 707, 284 SE2d 591).

. It is difficult to understand Chief Judge Kaye’s portrayal of Perkins as an "exception” to Miranda for two reasons: First, nowhere does the Supreme Court portray it as such. When the Court has intended a Miranda exception, it has said so explicitly (see, New York v Quarles, 467 US 649, 656). Second, the Supreme Court’s reasoning in Perkins is aimed not at drawing a necessary exception to Miranda (compare, New York v Quarles, supra), but at explaining Miranda and showing how Miranda and Perkins are in fact consistent.

. Alls told Rhodes that he did not initiate the fight, was not the aggressor but had acted only in self-defense. The jury, by its verdict, did not believe the justification defense.